# In the United States Court of Federal Claims

No. 18-1395C

(Filed: September 25, 2019)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| FOX LOGISTICS AND CONSTRUCTION COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Third-Party Beneficiary; Implied-In-Fact Contract; Duty of Good Faith and Fair Dealing; Privity of Contract; Tucker Act; 28 U.S.C. § 1491; Subject-Matter Jurisdiction; RCFC 12(b)(1). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Hal A. Emalfarb*, Emalfarb, Swan & Bain, Highland Park, Illinois, for Plaintiff Fox Logistics and Construction Company.

*Michael D. Snyder*, with whom was *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, Commercial Litigation Branch, *Steven J. Gillingham*, Assistant Director, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., and *Rhonda Sumpter*, United States Air Force, Joint Base Andrews, Maryland, for Defendant.

OPINION AND ORDER

WHEELER, Judge.

In this case, plaintiff Fox Logistics and Construction Co. ("Fox") alleges that it was a third-party beneficiary of a contract between Lakeshore Engineering Services, Inc. ("Lakeshore") and the Department of the Air Force. In the alternative, Fox claims that it had an implied-in-fact contract with the Air Force. In either event, Fox alleges that the Air Force breached its duty of good faith and fair dealing.

Fox's claims are related to a construction contract between the Government and Lakeshore for the construction of Shindand Air Base in Afghanistan. Fox was one of

Lakeshore's subcontractors on the project, and alleges that it is owed approximately $11.7 million in damages for unpaid work and other costs associated with the construction of the base.

Now before the Court is the Government's motion to dismiss this case for lack of subject-matter jurisdiction. For the reasons that are discussed below, the Court STAYS consideration of the Government's motion to dismiss, pending completion of limited discovery on the issue of the Court's jurisdiction over this case.

Background

In April of 2006, the Air Force awarded Lakeshore a contract for heavy engineering repair and construction work at Shindand Air Base in Afghanistan. Compl. ¶ 5. The Air Force waived the usual bond requirements for the project because the base was located in a war zone. Id. ¶ 6. On August 23, 2012, the Air Force issued Task Order FA8903-06-D-8505-0042 ("TO 42") to Lakeshore for infrastructure work on the air base. Id. ¶ 7. Lakeshore hired Fox as a subcontractor responsible for the TO 42 construction on October 12, 2012. Id. ¶ 8.

By May of 2013, Lakeshore was behind on both construction and payments to its subcontractors. See id. ¶¶ 10-11. Between May 2013 and January 2014, the Air Force issued three Show Cause Notices to Lakeshore, requesting that Lakeshore provide assurances that it was willing and able to complete TO 42. Id. ¶¶ 10-13. Each of these Show Cause Notices resulted in part from Lakeshore's inability to pay its subcontractors. See id. Some subcontractors, including Fox, refused to continue work on Lakeshore's projects until they were paid. E.g., Dkt. 15-1 at 3. The third Show Cause Notice, issued by Contracting Officer Captain Rebecca Ban on January 7, 2014, warned Lakeshore that unless it "submit[ted] acceptable assurances within ten . . . days" TO 42 could be terminated for default. Compl. ¶ 13.

On January 17, 2014, Lakeshore responded to the third Show Cause Notice. Id. ¶ 14. In its response, Lakeshore proposed creating a "designated holding account" into which the Air Force could deposit the funds for three task orders Lakeshore was working on, including TO 42. Dkt. 29-1 at 1. (In their course of dealing, the parties sometimes referred to the designated holding account as the "special account." See, e.g., Compl. ¶ 21.) Lakeshore gave designated Air Force personnel view-only access to the account, so that they could monitor how funds were distributed from it. Id. ¶ 18.

In a February 7, 2014 memorandum, Captain Ban agreed to Lakeshore's proposal. Id. Captain Ban informed Lakeshore that future invoices must include "subcontractor payment certifications" and that Lakeshore must pay its subcontractors as soon as it received money from the Air Force. Id. Additionally, the Air Force required Lakeshore to create payment plans for each subcontractor for which it was in arrears. Id. These

payment plans had to be signed by the subcontractor, include the amounts owed to the subcontractor, detail the amount that Lakeshore would actually be paying to the subcontractor, and include the date by which Lakeshore intended to pay all of the money it owed to the subcontractor.  Id.  Captain Ban also said that Lakeshore would not "be allowed to retain funds for their own in-country expenses" other than money necessary for "life support and security."  Id.  Finally, Captain Ban warned Lakeshore that the Air Force would be monitoring the transactions out of the designated holding account, and that "[i]f at any time, transactions d[id] not occur in accordance with the approved subcontractor payment certification" the task order would "be immediately terminated for default."  Id.

Lakeshore contacted Mushtaq Habibi, Fox's Director General, to explain these requirements, and obtain his consent to Lakeshore's payment plan for Fox.  See Dkt. 26-9 at 56-57.  After consulting by email with two Air Force officers, Mr. Habibi consented to the payment plan.  Id. at 56-57, 65, 67.

At first, the new plan appeared to be working.  Between February and May of 2014, Lakeshore paid Fox $4,052,085.01.  See Compl. ¶ 27.  Unfortunately, on May 1, 2014, Lakeshore abandoned TO 42.  Id. ¶ 28.  The next day it filed for bankruptcy in the United States.  Id. ¶ 29.  At the time it declared bankruptcy, Lakeshore still owed Fox more than $3,000,000.  Id. ¶ 47.  Fox has incurred more than $8,000,000 in uncompensated expenses since then.  Id.  Fox attempted to recover the money it was owed during Lakeshore's bankruptcy proceeding, but was unsuccessful.  See id. ¶ 31.  Fox then filed a certified claim with Captain Ban, asking to be paid the money it was owed under TO 42.  Id. ¶ 31.  Captain Ban denied Fox's claim on October 24, 2017.  Id. ¶ 32.

On September 13, 2018, Fox filed this suit.  On April 15, 2019, the Government filed a motion to dismiss Fox's complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  Fox filed a response to the motion to dismiss on June 28, 2019, and the Government filed its reply on August 6, 2019.  The Court heard oral argument on the motion on September 4, 2019.

Discussion

A. Standard of Review

Whether the Court has jurisdiction to decide the merits of a case is a threshold matter.  See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007).  When deciding a Rule 12(b)(1) motion to dismiss, a court must assume all the undisputed facts in the complaint are true and draw reasonable inferences in the non-movant's favor. Acevedo v. United States, 824 F.3d 1365, 1368 (Fed. Cir. 2016).  Further, the plaintiff bears the burden of establishing facts sufficient to invoke this Court's jurisdiction by a preponderance of the evidence.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  In determining whether a plaintiff has met this burden, courts may

look "beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists." Lechliter v. United States, 70 Fed. Cl. 536, 543 (2006) (quoting Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991)). When jurisdictional facts are in dispute, jurisdictional discovery is appropriate. Hopi Tribe v. United States, 113 Fed. Cl. 43, 50 (2013) (citing Samish Indian Nation v. United States, No. 2-1383L, 2006 WL 5629542, at *4-6 (Fed. Cl. 2006); E. Trans-Waste of Md., Inc. v. United States, 27 Fed. Cl. 146, 148 n.1 (1992)).

B. Plaintiff's Claims

For this Court to have jurisdiction over a breach of contract claim against the United States, there must be privity of contract between the plaintiff and the Government. Cent. Transp. Int'l, Inc. v. United States, 63 Fed. Cl. 336, 338 (2004). "Absent privity . . . there has been no waiver of sovereign immunity" and the Court does not have jurisdiction over the claim. Id. However, a plaintiff need not be in direct privity; status as a third-party beneficiary to a contract with the Government will suffice to give the Court jurisdiction. See Anderson v. United States, 344 F.3d 1343, 1352 (Fed. Cir. 2003). The Court also has jurisdiction to hear claims relating to implied-in-fact contracts with the Government. Id. at 1351 n.2 (citing Maher v. United States, 314 F.3d 600, 603 n.1 (Fed. Cir. 2002)).

In its complaint, Fox asserts that it was a third-party beneficiary of the contract between Lakeshore and the Government. In the alternative, Fox claims that it had an implied-in-fact contract with the Government. Either theory, if supported by a preponderance of the evidence, would give the Court jurisdiction to hear Fox's claims.[1] See Turping v. United States, 913 F.3d 1060, 1065 (Fed. Cir. 2019).

1. Third-Party Beneficiary

It is not easy for a plaintiff to prove that it is a third-party beneficiary of a contract. The third party is "entitled to a benefit promised in a contract . . . only if the contracting parties so intend." Astra USA, Inc. v. Santa Clara County, 563 U.S. 110, 117 (2011). The parties' intent to benefit the third party can be either "express or implied," but it must be "fairly attributable to the contracting officer." G4S Technology LLC v. United States, 779 F.3d 1337, 1340 (Fed. Cir. 2015) (quoting Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001); Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1263 (Fed. Cir. 2005)). The parties to the contract must intend to benefit the third party directly; incidental benefits

---

[1] In its complaint, Fox also alleges a third claim for relief: that the Government breached the implied duty of good faith and fair dealing it owed to Fox as a third-party beneficiary of the contract between the Government and Lakeshore. Compl. ¶¶ 62-63. For the reasons discussed more fully below, this claim is derivative of Fox's third-party beneficiary claim. Since the Court has STAYED consideration of the Government's motion to dismiss the third-party beneficiary claim, it also STAYS consideration of the motion to dismiss Fox's claim for breach of the implied duty of good faith and fair dealing.

4

are not enough.  See id. at 1341; Glass, 258 F.3d at 1354.  The Government's intention to benefit a third party can be established by circumstantial evidence.  G4S, 779 F. 3d at 1341.

There is a thin line between a contract that directly benefits a third party and one that does not.  This is especially true because "the government's conduct should be evaluated in the context of its responsibility to protect the public interest."  Id.  The cases that evaluate this issue often turn on fine distinctions, such as the method used to pay the third party.  For instance, in D & H Distributing Co. v. United States, the Federal Circuit held that a subcontractor was a third-party beneficiary to a contract because the Government made payments into an account held jointly by the prime contractor and the subcontractor.  102 F.3d 542, 546-48 (Fed. Cir. 1996).  Similarly, in J.G.B. Enters., Inc. v. United States, the Circuit held that the contract created a direct benefit because the Government's "payments to the prime contractor were held in escrow for the third-party subcontractor."  497 F.3d 1259, 1260, 1261 n.1 (Fed. Cir. 2007).  In contrast, the Circuit found that there was no direct benefit in G4S Technology LLC v. United States, because in that case payment was made directly to the prime contractor's general fund, even though the Government knew that the prime contractor owed subcontractors money for work done on the contract.  779 F.3d at 1342.

The Federal Circuit's decision in G4S illustrates how fact intensive the inquiry into whether a contract directly benefits a third party is.  In that decision, the court considered each of the government's public and private statements about the contract, as well as the specific details of how the subcontractor was paid.  See id. at 1338-43.  Only after considering the complete factual record before it did the Circuit conclude that the subcontractor, G4S, did not directly benefit from the contract because the Government did not "provide[] guarantees directly to G4S" or "arrange[] to pay G4S itself."  Id. at 1343.

This Court, too, recognized the need to fully develop the factual record in G4S.  Initially, the Government filed a motion to dismiss for lack of subject-matter jurisdiction, based on what it claimed was the lack of privity between itself and G4S.  See G4S Tech. LLC v. United States, 114 Fed. Cl. 662, 668 (2014).  Judge Firestone determined "that G4S had raised a non-frivolous claim," and ruled that the Court had jurisdiction over the case if G4S was a third-party beneficiary of the contract between the Government and the prime contractor.  See G4S, 779 F.3d at 1339-40; G4S, 114 Fed. Cl. at 668.  Accordingly, she "ordered discovery on the limited issue of whether G4S could establish a contractual right to recovery against the United States."  G4S, 114 Fed. Cl. at 668.

Judge Firestone's reasoning is persuasive in this case.  Like G4S, Fox raises non-frivolous claims in its complaint.  It is undisputed that the Government was concerned about Lakeshore's repeated failures to pay its contractors.  See Dkt. 26-1 at 1.  As counsel to Fox acknowledged during oral argument, the original contract between Lakeshore and the Government was not intended to directly benefit Fox or any other subcontractor.  However, Fox argues that the Government modified its contract with Lakeshore in March

5

of 2014 with the intention of specifically benefitting Fox.  Compl. ¶ 45.  To support this contention, Fox cites Captain Ban's February 7, 2014 memorandum to Lakeshore approving the creation of the holding account and specifying how the funds from the account were to be distributed.  Id. ¶ 40.  Fox claims that Captain Ban used this memorandum "to modify TO 42" with the "intent[] to protect and benefit Fox."  Id.

Fox provides some objective evidence to support this claim.  For instance, Mr. Habibi says that he relied "on the verbal and written statements of Contracing [sic] Officer's Representatives Capt. Benjamin Knost, Maj. Karlo Jajliardo, Lt. Col. Greg Reich, and Lt. Col. Michael Greer," who apparently told him that the Government "would take appropriate measures to directly pay Fox . . . thereby bypassing the cash flow problems Lakeshore [faced]."  Dkt. 26-8 at 6.  Major Jajliardo later sent Mr. Habibi another email, in which he asked for updated information on how much money Lakeshore owed Fox.  Id.  The Major "stress[ed] how importation this info [was]," and implied that it would be applied to "useful purposes."  Id.; see also Dkt. 26-9 at 47.

Mr. Habibi understood these and other actions by the Government to indicate that it had assented to his demand that the Government control Lakeshore's holding account before Fox would go back to work—that is, that the Government intended to directly benefit Fox.  Dkt. 26-8 at 7-8; Dkt. 26-9 at 44, 52.  Fox alleges throughout its complaint that Captain Ban was aware of and specifically authorized communications between Air Force officers and Fox.  E.g., Compl. ¶¶ 23, 26, 37-38.

The Government maintains that it never modified its contract with Lakeshore, and that if it did, it did not do so with the express intention of benefitting Fox.  In support of this contention, the Government provided as Exhibit A to its motion to dismiss the declaration of Lara Schoenenberger,[2] a project manager for the Air Force who oversaw Lakeshore's work on TO 42.  See Dkt. 15-1 at ¶¶ 7, 10, 12.  However, Ms. Schoenenberger was neither the contracting officer nor one of the Air Force officers that directly contacted Fox.  She therefore is not able to deny that Captain Ban intended to directly benefit Fox or that Captain Ban was aware of and authorized the communications between the Air Force officers and Fox.

It may well be that after the factual record is more fully developed, Fox is unable to demonstrate that it is a third-party beneficiary of the contract between Lakeshore and the Government.  However, Fox has raised a non-frivolous claim that it is a third-party beneficiary and is entitled to additional discovery on this point.  Therefore, the

---

[2] In a motion filed with the Court on September 13, 2019, Fox moved to exclude eleven paragraphs of Ms. Schoenenberger's declaration, or in the alternative for the Court to hold a hearing to supplement the evidentiary record before the Court ruled on the Government's motion to dismiss. Dkt. 31 at 13-14.  Given the Court's decision to STAY consideration of the Government's motion to dismiss until after the completion of jurisdictional discovery, Fox's motion is DENIED as moot.

Government's motion to dismiss Count One of Fox's complaint is STAYED pending the completion of jurisdictional discovery.

      2. <u>Implied-In-Fact Contract</u>

Implied-in-fact contracts with the Government are also difficult to prove. Implied-in-fact contracts are contracts inferred by a court when "the light of the surrounding circumstances" demonstrates a meeting of the minds between the parties, even if the agreement was never formalized. <u>Turping v. United States</u>, 913 F.3d 1060, 1065 (Fed. Cir. 2019) (quoting <u>Hanlin v. United States</u>, 316 F.3d 1325, 1328 (Fed. Cir. 2003). In order to establish an implied-in-fact contract, the plaintiff must demonstrate the same elements needed for an express contract. <u>Id.</u> Specifically, the plaintiff must prove "(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) 'actual authority' on the part of the Government's representative to bind the Government in contract." <u>Id.</u> (quoting <u>Hanlin</u>, 316 F.3d at 1328). Plaintiffs must prove "by objective evidence, the existence of an offer and a reciprocal acceptance" in order to show the "mutuality of intent" necessary for the formation of an implied-in-fact contract. <u>Id.</u>

As both parties have acknowledged, the Court must contemplate similar facts when considering Fox's third-party beneficiary and implied-in-fact contract claims. <u>See</u> Compl. ¶ 49; Dkt. 15 at 21. As with its third-party beneficiary claim, Fox raises a non-frivolous claim that the contracting officer intended to enter into a contract with it.

The Government asserts that Fox's claim for breach of an implied-in-fact contract should be dismissed because Fox cannot show "mutuality of intent, an unambiguous offer and acceptance, or an exercise of actual authority on the part of . . . the contracting officer." Dkt. 15 at 21. In contrast, Fox claims that Captain Ban's February 7, 2014 memorandum to Lakeshore approving the creation of the holding account and specifying how the funds from the account were to be distributed created the implied-in-fact contract between the Government and Fox. The Government, Fox says, "manifested its intent to accept Fox's offer to return to work in exchange for the [Government] . . . taking steps to protect and compensate Fox." Compl. ¶ 56.

Fox points to at least some objective evidence to support its claims. As discussed more fully above, Mr. Habibi says that he had extensive verbal and written communications with Contracting Officer's Representatives who assured him that the Government was taking steps to ensure that Fox was paid for its work. Dkt. 26-8 at 6. Fox asserts that these communications were specifically authorized by Captain Ban, the Contracting Officer. Compl. ¶¶ 23, 26, 37-38. Fox has provided the Court with a number of emails that partially corroborate its version of events. The Government disputes Fox's account, but ultimately it fails to fully refute it. Without sworn statements from Captain Ban or her Representatives specifically denying Fox's assertion that Captain Ban intended to contract with Fox, the Court must take Fox's allegations—supported by some evidence—as true.

On this claim, too, Fox may ultimately be unable to prove that the Court has jurisdiction. However, Fox has raised a non-frivolous claim that it had an implied-in-fact contract with the Government, and is entitled to more fully develop the factual record before the Court rules on the Government's motion to dismiss. Therefore, the Government's motion to dismiss Count Two of Fox's complaint is STAYED pending the completion of jurisdictional discovery.

### 3. Breach of the Implied Duty of Good Faith and Fair Dealing

In its complaint, Fox also alleges a third claim for relief: that the Government breached the implied duty of good faith and fair dealing it owed to Fox as a third-party beneficiary of the contract between the Government and Lakeshore. Compl. ¶¶ 62-63. The Federal Circuit has held that "[e]very contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." Dobyns v. United States, 915 F.3d 733, 739 (Fed. Cir. 2019). However, the implied duty "cannot expand a party's contractual duties beyond those in the express contract." Id. (quoting Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 831 (Fed. Cir. 2010)). Therefore, if Fox was not an intended third-party beneficiary of the contract between the Government and Lakeshore, it cannot recover for a breach of the implied duty of good faith and fair dealing. The Court has STAYED consideration of the Government's motion to dismiss Fox's third-party beneficiary claim, so it will not address whether Fox's implied duty claim should be dismissed at this time.

The Government's motion to dismiss Count Three of Fox's complaint is therefore also STAYED pending the completion of jurisdictional discovery.

### Conclusion

For these reasons, the Government's motion to dismiss is STAYED pending the completion of limited discovery on the issue of jurisdiction. Additionally, Fox's motion to exclude portions of Ms. Schoenenberger's declaration is DENIED as moot. The parties shall file a joint status report no later than Friday, October 11, 2019, proposing a schedule for jurisdictional discovery, and for supplemental briefing following the completion of discovery.

IT IS SO ORDERED.

s/ Thomas C. Wheeler  
THOMAS C. WHEELER  
Judge