# In the United States Court of Federal Claims

No. 18-1395 C
Filed: May 31, 2024

<table>
<tr><td>FOX LOGISTICS & CONSTRUCTION COMPANY,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="text-align:center"><em>Plaintiff,</em></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>THE UNITED STATES,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="text-align:center"><em>Defendant.</em></td><td>)</td></tr>
</table>

*Hal A. Emalfarb*, Emalfarb Law, Northbrook, IL, for Plaintiff.

*Michael D. Snyder*, U.S. Department of Justice, Civil Division, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Stephen J. Gillingham*, Assistant Director, and *Rhonda Sumpter*, of counsel, for the Defendant.

## OPINION AND ORDER

This case involves a subcontractor's efforts to secure payment from the United States for damages alleged to have been incurred on a project to upgrade an air force base in Afghanistan. Although the subcontractor was performing much, if not most, of the work, it was a subcontractor. The prime contractor began having cash flow problems on various projects around Afghanistan, and the subcontractor went unpaid. The Air Force then took steps to enforce provisions of its contract to require the prime contractor to pay its subcontractors and to document both subcontractor agreement to a repayment plan and proper payments going forward. The Air Force also agreed to deposit future payments into a new bank account that allowed the Air Force to view the account and monitor transactions. But the payments otherwise stayed the same: the Air Force paid the prime contractor, which then had to pay its subcontractors. This arrangement worked for a time, until the prime contractor went into bankruptcy. The question is whether the subcontractor can enforce either an implied-in-fact contract or the prime contract as a third-party beneficiary. Based on the undisputed material facts, the subcontractor cannot. Therefore, the court grants the Government's motion for summary judgment.

I.      **BACKGROUND**[1]

A.      **Task Order 42.**

FOX Logistics and Construction Company ("Fox") is a contractor located in Kabul, Afghanistan.  ECF No. 101 at 1.  Lakeshore Engineering Services, Inc. ("Lakeshore") was a contractor based in Michigan.  *Id.*  This action focuses largely on the performance of Task Order No. 42 ("TO 42") that the U.S. Air Force awarded Lakeshore under Federal Prime Contract # FA8903-06-D-8505.  *Id.* at 2.  Following the issuance of TO 42, Lakeshore in turn awarded Fox Subcontract PO07684 to support TO 42.  ECF No. 88-2 at 619; ECF No. 101 at ¶ 4 (Def's Resp. to Pltf's Statement of Facts).[2]

TO 42 required Lakeshore to "accomplish the effort described in" the attached Statement of Work and Statements of Requirements.  ECF No. 88-2 at 407.  According to the Statement of Work, the contract was for "[c]onstruction of Afghan Air Force Expansion, Shindand Air Wing Phase II, Air Traffic Control and Landing Systems (ATCALS), and Central Utilities for Afghan National Security Forces at Shindand Air Base, Herat Province, Afghanistan."  *Id.* at 418.  TO 42 contained two Contract Line Item Numbers ("CLINs"): (1) Item 2003 - Construction Effort, and (2) Item 2004 - Reports and Data Exhibits A & B; Item 2003 contained three sub-CLINs: Item 2003AA - Afghanistan Air Force Expansion Shindand Air Wing PH II (CLIN 2003AA), Item 2003AB - Central Utilities For Afghan National Security (CLIN 2003AB), and Item 2003AC - Airfield Traffic Control and Landing Systems (ATCALS) (CLIN 2003AC).  *Id.* at 407-08.  The contract directed Lakeshore to submit invoices to the Defense Financial Accounting Service ("DFAS").  ECF No. 85-1 at App1.  In return, DFAS would pay Lakeshore.  *Id.*

The contract also included several provisions that were meant to ensure contractors properly paid their subcontractors.  First, the contract included 48 C.F.R. (FAR) § 52.232-5.  ECF No. 88-2 at 411 ("Payments Under Fixed-Price Construction Contracts").  This requires prime contractors to submit certain information with each request for payment, including an identification of the amount sought for work done by each subcontractor, the total amount of each subcontract, and "[a] listing of the amounts previously paid to each subcontractor under the contract."  FAR § 52.232-5(b).  In addition, the contractor may need to provide "[a]dditional supporting data in a form and detail required by the Contracting Officer."  *Id.* § 52.232-5(b)(v).  Finally, an appropriate official at the contractor must certify that "to the best of my knowledge and belief . . . [a]ll payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification."  *Id.* § 52.232-5(c)(2).  It also requires prime contractors to certify that a "request for progress payments does not include any amounts

---

[1] Because the background of this matter is presented at length in a prior reported decision, 145 Fed. Cl. 236 (2019), the background included here is that relevant to the resolution of the pending motion.  Although this section is based on undisputed facts apparent from the record, nothing in this section constitutes findings of fact.

[2] The court cites to ECF No. 101 for the parties' statement of facts because it contains the Government's response that a fact is not disputed.

which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract." *Id*. § 52.232-5(c)(3)

Second, the contract included Contract Clause 952.225-0004, ECF No. 88-2 at 593, which states that "[t]he Contractor shall comply with, and ensure that its employees and its subcontractors and their employees, at all tiers, are aware of and obey all . . . Host Nation laws." As relevant here, Chapter 5 of Afghanistan's labor laws provided under "Payment of Wage to Employee" that "payment of wage shall be made during the same month and shall not be delayed without consent of the employee." *Id.* at 701.

### B.    Task Order performance.

On October 24, 2012, Lakeshore awarded Fox subcontract PO07684 in support of TO 42. ECF No. 88-2 at 619.  On or about January 16, 2013, Lakeshore "issued Change Order No. 0001 to FOX . . . [which] increased FOX's Subcontract by $24,156,000 to $39,488,000." ECF No. 101 at 2.  Fox apparently ceased work on PO07684 on or around April 7, 2013.  ECF No. 88-2 at 696 (citing 7 Apr 2013 Title II Daily Report).  This was because of Lakeshore's struggles to make timely payments to Fox for its work on TO 42.  ECF No. 101 at 7 ¶ 25; *see also* ECF No. 88-2 at 328 ("[M]uch of the delay is attributable to the Prime Contractor, Lakeshore-Toltest Corporation (LTC), who had several times stopped the project through non-payment of invoices.").

On May 29, 2013, the Air Force sent Lakeshore a Cure Notice ("May 29 Notice").  ECF No. 85-1 at App10.  The May 29 Notice stated that Lakeshore was on a "40 day work stoppage and counting," that the project was "scheduled to be 60% complete, but is only 13% complete," and that Lakeshore had fallen "4-5 months behind on sub-contractor invoices while the Government has paid in full for all completed work." *Id.*  It further stated that "within ten (10) days of receipt of this letter" the TO 42 Contracting Officer "may terminate this task order for default" unless "1. LES [Lakeshore] shall resume work on project, and 2. provide a Corrective Action Plan detailing how LES [Lakeshore] will catch up on sub-contractor invoices and recover lost time on schedule." *Id.*

Lakeshore then hired new management personnel, resumed some construction activities and began getting the workforce back on base.  It also submitted a revised schedule that promised to double the workforce and implement day and night shifts to get the work completed expeditiously.  Finally, Lakeshore stated it had "resolved all their [sic] cash flow situation . . . [which has] allowed Lakeshore to fully pay its subcontractors and vendors on this project and to ensure that they will be paid on a timely basis in the future."  ECF No. 85-1 at App11.

After work resumed, the Air Force sent Lakeshore a Show Cause Notice on July 12, 2013 ("July 12 Notice").  *Id.*  While acknowledging Lakeshore's efforts, the July 12 Notice catalogued Lakeshore's continued shortcomings.  The July 12 Notice stated that "construction activities have resumed slightly" but had not resumed to the level that would "meet the conditions of the [May 29] Cure Notice." *Id.*  It recognized that Lakeshore "submitted a revised schedule," but found that the revised schedule "extremely aggressive" and that Contracting Officer Rendon was "not convinced [Lakeshore] will not slip" for a variety of reasons. *Id.* at App12.  The July 12 Notice also acknowledged that Lakeshore "has promised to double the workforce and implement

both day and night shifts as an acceleration measure," but stated that "[i]t is not clear if [Lakeshore] is speaking in the Cure Notice about the existing current labor pool or some other labor mix," that "the same workers cannot perform both shifts without increased risk to the health and safety of the workforce," and that "[Lakeshore] does not appear to have addressed the provision of additional construction equipment required for a dual-shift schedule." *Id.*  It further acknowledged that Lakeshore "hired a new Project Executive . . . and a new Site Project Manager," but observed that "adding or changing key personnel raises a concern over delays and additional costs to the government for mobilization to the site." *Id.* at App13.  Finally, the July 12 Notice required Lakeshore to "provide documentation to substantiate their statement of good-standing with all subcontractors." *Id.*

Based on these issues, the July 12 Notice informed Lakeshore that the Government was "considering terminating CLINS 2003AA and 2003AB of the task order under the provisions for default." *Id.* at App11.  But the Air Force made clear that Lakeshore would be "given the opportunity to present, in writing, any facts bearing on the question to the Contracting Officer, within 10 days after receipt of this notice." *Id.*  In its written response, Lakeshore would have to provide: 1) "a resource-loaded schedule and LSA expansion plan to demonstrate that the workforce proposed will be capable of performing the remaining tasks according to a dual-shift schedule"; 2) "an updated material procurement schedule which includes a listing of intended vendors, substantiated by quotes that verify fabrication and shipping can be accomplished within the stated timeframes"; and 3) "documentation to substantiate [its] statement of good-standing with all subcontractors." *Id.* at App11-App13.  If Lakeshore did not provide excuses for its shortcomings, the Air Force would assume that no excuses existed. *Id.* at App11.  The July 12 Notice also made clear that "[a]ny assistance given to you on this contract or any acceptance by the government of delinquent goods or services will be solely for the purpose of mitigating damages and it is not the intention of the government to condone any delinquency or waive any rights the government has under the task order." *Id.* at App11.

On September 9, 2013, the Air Force sent Lakeshore a memorandum on "Non-Payment of Subcontractors." *Id.* at App15.  The memorandum stated that six subcontractors, including Fox, claimed they "have not been paid" by Lakeshore "in over 30 days" for "work that they have performed under [Lakeshore's] subcontracts." *Id.*  The memorandum stated that the Air Force "need[s] to have verification of payment to your subcontractors, as such payments must be made timely under the terms of your contract." *Id.*  The memorandum reminded Lakeshore that such verification was required by Contract Clause 52.252-5, and that Lakeshore "ha[d] certified that you paid your subcontractors in May, June and July," meaning "[i]f this is true, you [Lakeshore] are in violation of the terms of the payment clause and have provided false or fraudulent certifications of payments to your subcontractors." *Id.*  The memorandum directed Lakeshore "to provide proof of current and timely payment to your subcontractors" within "4 calendar days from receipt of this letter," and stated that failure to do so "will result in my pursuit [sic] civil or criminal remedies as indicated." *Id.* at App16.

After receiving this memorandum, Lakeshore became current on subcontractor payments to Fox. *Id.* at App28.  Because of this, "the Contracting Officer gave Lakeshore permission to continue construction, averting termination, with the qualification that future production and work-force issues would be cause for reconsideration of the termination for default." *Id.*  After being paid by Lakeshore, Fox increased production. *Id.*

But then, by the end of 2013, as Fox began to exhaust on-site materials and funds, it again faced a risk of work stoppage.  *Id.* at App20, App28.  The Air Force heard from Lakeshore that Fox was going unpaid due to "customer-directed suspensions of work" in November 2013, which the Air Force rejected as "not an acceptable reason for non-payment of subcontractors for previously completed and invoiced work."  *Id.* at App28.  In December 2013, Mushtaq Habibi, Director General of Fox, contacted Air Force Officer in Charge (OIC) Lt. Col. Greg Reich, Contracting Officer's Representative Maj. Karlo Jajliardo, and Lakeshore's Project Manager Neal Ridgeway; Habibi explained to them that Fox's ability to complete its work on TO 42 was imperiled by Lakeshore's failure to pay Fox.  ECF No. 88-2 at 336-37 ("I see no success in getting funds from LTC, they have thousand financial gaps and any penny they receive they just fill those gaps elsewhere not on this project.").  Nonetheless, Habibi emphasized that "FOX is yet trying to move forward with the project."  ECF No. 88-2 at 336; *see also* ECF No. 88-2 at 339 ("The Major was in a pretty down mood to start the meeting.  But by the end of the meeting when he heard about the hangar containers coming in and potential new concrete suppliers I think he realized just how hard FOX wants to complete this project.  It was actually very amazing to watch.").  To make the project work, Habibi suggested that the Air Force pay Fox directly for any amount owed under a Lakeshore invoice and that Fox would pay Lakeshore whatever amount it was due under each invoice.  ECF No. 88-2 at 336.  Habibi stated his belief that "this option of direct payment to FOX approved by all parties will not be beyond contractual obligation of AFCEC and LTC and it would rather speed up the process of construction and I can guarantee you that we can accomplish this job successfully."  *Id.* at 337.

On January 7, 2014, Habibi again contacted Lt. Col. Reich and Maj. Jajliardo and explained the steps Fox was taking to keep the project going, including the "need to order all the long lead items and this will not be able to happen with two invoices only."  ECF No. 88-2 at 342.  Habibi added that "[p]ayment issues must be solved before Jan 15th."  *Id.*  Maj. Jajliardo responded that it was his understanding that Lakeshore "has proposed that payments be made to a joint account where both parties would control payments out of [sic]," explaining that a joint account "is one where two parties can legally withdraw funds (without approval from the other[)]."  ECF No. 88-2 at 740.  He also asked whether Habibi had "verified these controls would be in place from the bank directly (not simply believing [Lakeshore])" and requested Habibi to confirm whether "truly NO money whatsoever could be removed without FOX approval . . . It would be helpful to know this independently, and what the terms are specifically for the account."  *Id.*

Also on January 7, 2014, the Air Force issued another Show Cause Notice ("January 7 Notice").  ECF No. 88-2 at 736.  The January 7 Notice explained that "Lakeshore's non-payment to subcontractors" was "endangering performance" under TO 42, and that this was "cause for reconsideration of the termination of remaining CLINs 2003AA and 2003AB under the provisions for default of this task order."  *Id.*  While production had been increased since the July 12 Notice, the Air Force emphasized this time that "[t]he remaining work on CLINs 2003AA and 2003AB are [sic] still only 51% complete."  *Id.* at 737.  The January 7 Notice reminded Lakeshore that it was required by law and contract to make payments to subcontractors "in full within 7 days of receipt of payment from the Government."  *Id.*  Because of Lakeshore's nonpayment of subcontractors, the Air Force rejected Invoice 26 on December 19, 2013.  At that time, Lakeshore owed Fox $3,551,663.42 on unpaid invoices.  *Id.*; *see also id.* at 347.  Fox responded that Lakeshore owed it $5,857,395.58.  *Id.* at 360.  Fox also stated in an email that "if

AFCEC strongly oversights [sic] the account and redirects invoices to FOX without [LES]'s involvement of transfer . . . then [it] is agreeable to us." *Id.* at 753.

The January 7 Notice further stated that "[i]f it is not Lakeshore's intention to repudiate this contract, the government requests specific assurances of its ability to make payments and perform the remaining construction work to completion." *Id.* at 737. Specifically, the January 7 Notice instructed Lakeshore to "[p]rovide documentation to verify payment to all sub-contractors, or explanation as to why there is a discrepancy between what has been approved and what has been paid" and "provide the Government with a corrective action plan to prevent continual financial issues from affecting future performance and completion of the project." *Id.* at 738. Further, the January 7 Notice said that "[u]nless Lakeshore submits acceptable assurance requested within ten (10) days of receipt of this letter, the undersigned may terminate this task order for default." *Id.* And "[a]ny assistance given to you on this contract or any acceptance by the Government of delinquent goods or services will be solely for the purpose of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract." *Id.*

On January 8, 2014, Ridgeway forwarded Habibi a copy of the January 7 Notice from the Contracting Officer. On January 10, 2014, Habibi was contacted for the first time by Joseph Saldutti, Managing Director of Gridiron Capital and member of the board of Lakeshore. ECF No. 88-2 at 993. Saldutti told Habibi that "[b]oth projects [TO 42 and another Task Order] are hanging in the balance and on both projects we can pay out the full amount of the PO to Fox and also ourselves if we can continue to invoice and complete them which we hope to achieve." *Id.* The following Tuesday, Ridgeway told Habibi that Saldutti would meet with the Contracting Officer, Captain Rebecca Ban, later that week on January 16 "to negotiate an appropriate resolution to AFCEC's January 7, 2014 Show Cause letter." ECF No. 88-2 at 355.

At the meeting, Lakeshore responded to the January 7 Notice by stating "Lakeshore has already established a designated holding account with its bank per the attached Letters of Direction for each of our current Task Orders 8505-00 (32, 35 & 42)." *Id.* at 886. Lakeshore proposed to the Air Force that it deposit future payments on the three task orders into this "special account," and stated that "[a]ll proceeds deposited by AFCEC into the designated account will be for the Direct Costs (primarily subcontract costs), Site Funds & Field Overhead such as LSA and Payroll for those specific projects. Lakeshore will not take and [sic] proceeds for Indirect Costs, Home Office Overhead, Fee or other corporate purposes from these accounts absent the express consent of AFCEC, until the projects are closed out." *Id.* Lakeshore emphasized that "[t]he accounts will be visible to AFCEC personnel (to be designated by AFCEC) who, upon AFCEC request and direction will have full viewing rights of all activity and statements in order to monitor incoming receipts and outgoing payables and, upon request, may be granted other rights in connection with this holding account." *Id.*

Capt. Ban agreed to use the special account. *Id.* at 1056. According to her, "[t]he special account was to further the project to completion because that would be worth more to the Government than terminating for default where [the Government] would be left with nothing." *Id.* at 64, 74 (101:14-23; 143:7-16). And she instructed Lakeshore that future invoices must include "sub-contractor payment certifications" and that Lakeshore must pay a subcontractor immediately upon receipt of payment by Lakeshore for the task order in question. *Id.* at 1058.

Additionally, Capt. Ban directed Lakeshore to create payment plans for each subcontractor with which it was in arrears. *Id.* These payment plans had to be signed by the subcontractor, include the amounts owed to the subcontractor, detail the amount that Lakeshore would actually be paying to the subcontractor, and include the date by which Lakeshore intended to pay all of the money it owed to the subcontractor. *Id.* Capt. Ban also warned Lakeshore that it would not "be allowed to retain funds for their own in-country expenses" other than money necessary for "life support and security," and that the Air Force would be monitoring the transactions out of the designated holding account, and "[i]f at any time, transactions d[id] not occur in accordance with the approved subcontractor payment certification" the task order would "be immediately terminated for default." *Id.* at 1058-59.

On January 17, 2014, Saldutti informed Habibi by email that Lakeshore was about to present a plan to AFCEC that included the "opening of a new bank account for TO 42 and our 2 other Afghanistan projects in AFCEC and provide them a letter of direction to send funds to this special account." *Id.* at 358.

The same day, Maj. Jajliardo sent to Habibi and Hussam Aqrabawi (Fox's project manager for TO 42) an incomplete spreadsheet of Lakeshore's payments to Fox, completed and still outstanding. ECF No. 88-2 at 362-66. Maj. Jajliardo further requested Fox "fill in the missing info for the amounts paid by LES to FOX. . . . Also, it would help greatly to have a scan of every single wire transfer received by FOX from LES." *Id.* at 360.

The following week, Lt. Col. Reich asked Habibi to provide him with Fox's "CAGE and DUNS codes." ECF No. 88-2 at 369. Fox did. *Id.* Lt. Col. Reich said he "forwarded this information to" Capt. Ban. *Id.* at 368. He then emphasized, "I'm not sure this will help. But, I want to do anything I can to help get your company and most importantly your workers paid." *Id.*

On January 23, Maj. Jajliardo sent Aqrabawi an updated spreadsheet of Lakeshore's payment history to Fox. ECF No. 88-2 at 371-72. Maj. Jajliardo said, "I cannot stress how important this info is, and to what useful purposes this will be applied to." *Id.* at 371. The next day, Maj. Jajliardo told Habibi that Lakeshore's "proposal is based on the assumption that FOX would agree to the payment proposal and the joint account—has FOX agreed to the LES plan?" *Id.* at 374. Habibi then told Maj. Jajliardo that "FOX has not yet agreed to their plan but our plan agreement will be based on AFCEC's overall control and monitoring of any special account" and that "[i]t was also asked from me whether FOX would trust AFCEC and our response was that FOX trusts AFCEC as a Govt body but we do not trust LTC as a reliable company. In contrary, FOX is waiting for AFCEC's control of the special account as there is no trust on LTC and their corporate gaming policies anymore." *Id.* at 376.

But discussions became more urgent when materials at the job site began to be used up. Habibi told Maj Jajliardo and Lt. Col. Reich that "FOX is [running] out of materials on site and the project is automatically going to be stopped due [sic] unavailability of resources in coming days" and that "FOX is only waiting for AFCEC to confirm their control of special account as part of LTC's response to the show cause letter, if AFCEC confirms it FOX will then sign the letter of support with LTC [Lakeshore]." *Id.* at 368.

By January 31, Lakeshore had come to an agreement with the Air Force.  Saldutti told Habibi: "We have . . . finalized arrangements with DFAS/AFCEC subject only to signatures . . . Also AFCEC has accepted the letters of direction with their full access rights to the account.  I attach a copy of that direction."  *Id.* at 378.

On February 3, 2014, Saldutti and Habibi executed and signed a Letter Agreement regarding Lakeshore's plan to repay Fox the overdue amount.  *Id.* at 380-81.  The Agreement stated that:

> [P]rior to our submission and/or receipt of any further invoices . . . for work that has been performed by Lakeshore and Fox, Lakeshore has established a special bank account that shall segregate all cash from Shindand TO 42 . . . Lakeshore has issued letters of direction to AFCEC that any and all invoice amounts or other proceeds related to such projects . . . shall be directed to such account . . . Lakeshore has provided AFCEC viewing or other account rights that AFCEC shall request in order to monitor and/or control (at its discretion and choice) the proceeds in order to ensure that payments are made in accordance with [this letter agreement] and in subsequent invoices in accordance with our contract with you.

*Id.* at 380.

Capt. Ban explained the terms of the new payment arrangement, including continued payment certifications but also certain new obligations (viewing rights, subcontractor-approved payment plans) in a memorandum to Lakeshore dated February 7, 2014.  *Id.* at 385-87.  The first draft of such a payment plan, for Invoices 26-29, was sent by Lakeshore Saldutti to Habibi on February 12.  *Id.* at 383.  The draft plan specified "that LES opens a special bank account and directs payment of all proceeds related to the Prime Contract received by LES from any invoices, potentially released LDs . . . and any proceeds of REAs or related claims that we may submit and AFCEC may agree and pay" and explained "[t]his special account shall provide AFCEC with full access viewing rights to monitor all proceeds."  *Id.* at 386.  Lakeshore requested that Fox consent to the payment plan.  *Id.* at 1066-67.

Habibi forwarded the email containing the draft payment plan "LTC is requesting FOX to sign" to the Contracting Officer's Representatives Lt. Col. Michael Geer, Capt. Benjamin Knost, and Maj. Jajliardo and asked "if it is required by AFCEC."  *Id.* at 1065.  Lt. Col. Geer responded that "[a]s part of the agreement with LTC, the Air Force requires that they have an agreement in place to ensure payment to their subcontractors before the Air Force will approve any invoices. In that sense, yes, this is something that AFCEC has asked of LTC."  *Id.* at 1069.  Capt. Knost replied, "Yes, AFCEC is requiring LTC to submit specific payment plans with each invoice to document how much you are being paid.  We have also provided a list of personnel who have been granted viewing rights to the account [to] which these proceeds will be deposited.  We will monitor disbursements to ensure compliance with whatever payment plan you and LTC agree on."  *Id.* at 391.

Saldutti again emailed Habibi on February 12, 2014, and said that "AFCEC informed us that it is not going to release any payments until this final (we hope) step is taken on the subcontractor plans.  Our lawyer and we believe that this partial plan/new letter totally satisfies their request."  *Id.* at 395.  To confirm, Habibi forwarded this email to Capt. Knost and Maj. Jajliardo, asking "if this is exactly the case."  *Id.* at 394.  After conferring with the contracting officer, Capt. Knost confirmed that "what Lakeshore has presented in terms of the sub-contractor plans is accurate.  We provided the direction in terms of what information must be included in the payment plans they submit.  The original plan they submitted did not fully comply with that direction, and they have updated the plan in accordance with our requirements."  *Id.* at 393.  Maj. Jajliardo's reply explained further that "[i]f LES was not accurately aware of what [documentation] was required[,] it doesn't mean it is a new requirement" because Lakeshore "will have to meet all the requirements of the Contracting Activity."  *Id.* at 394.  He explained further that any technical shortcoming in Lakeshore's submissions could cause delays in payment approval.  *Id.*

On February 14, 2014, Habibi signed the payment plan.  *Id.* at 1030.  After signing the plan, Fox returned to work.  Fox reports that it then received four payments totaling $4,052,085.01:

| Date | Amount |
|------|--------|
| 2/27/2014 | $3,309,855.00 |
| 4/19/2014 | $117,801.79 |
| 4/19/2014 | $128,847.00 |
| 4/29/2014 | $495,581.22 |

ECF No. 85-1 at App90 ¶ 38.  Habibi later noted that after the April 29th payment for Invoice 29, "the amount in errears [sic] to FOX increased with each billing cycle."  *Id.* at App92 ¶ 47.

### C.       Lakeshore abandons its work and declares bankruptcy.

On or about May 1, 2014, Lakeshore declared Chapter 7 bankruptcy.  Fox alleges Lakeshore owed it more than $3,000,000 at the time Lakeshore declared bankruptcy, and that it has incurred more than $8,000,000 in uncompensated expenses since.  ECF No. 1 ¶ 47.  Fox allegedly made an unsuccessful attempt during Lakeshore's bankruptcy proceeding to recover the money it claims Lakeshore owes it.  *Id.* ¶ 31; ECF No. 80 ¶ 32.  Fox then filed a certified claim with Capt. Ban, asking to be paid the money it was owed under TO 42.  ECF No. 1 ¶ 31.  Capt. Ban denied Fox's claim "and stated that Fox's claim would not be recognized, because the Air Force did not have a contract with Fox."  *Id.* ¶ 32; ECF No. 80 ¶ 32; ECF No. 85 at 14.

### D.       Complaint.

Fox then filed its complaint in this case on September 13, 2018.  ECF No. 1.  The Government moved to dismiss for lack of subject-matter jurisdiction.  ECF No. 15.  Following full briefing and argument on the Government's motion, the court stayed the motion, ECF No. 34, and granted jurisdictional discovery limited to the question of whether the Air Force intended to directly benefit Fox or create an implied-in-fact contract with Fox.  *Fox Logistics & Constr. Co. v. United States*, 145 Fed. Cl. 236, 239-43 (2019).  In that opinion, Judge Wheeler held that Fox had "raised non-frivolous claim[s]" that it was (i) a third-party beneficiary to a Government

contract and (ii) that it had an implied-in-fact contract with the Government. *Id.* at 241-42. Upon completion of the limited fact discovery, the Government renewed its motion to dismiss, again solely on jurisdictional grounds, ECF No. 53, and the court held oral argument, ECF No. 67. The court then ordered supplemental briefing in light of the Federal Circuit's decision in *Columbus Regional Hospital v. United States*, 990 F.3d 1330 (Fed. Cir. 2021), in which "the Circuit clarified that all a plaintiff must do to establish this Court's jurisdiction is plead a 'non-frivolous allegation' of its third-party beneficiary status and the existence of an implied-in-fact contract." ECF Nos. 68, 77 (citing *Columbus Reg'l*, 990 F.3d at 1341-42). The Government informed the court it would withdraw its renewed motion given the court's findings that Plaintiff's claims here are non-frivolous under *Columbus Regional*, so the court denied both motions to dismiss. ECF No. 77. Further fact discovery was propounded on the issue of liability, ECF No. 78 at 3-4, and following the Government's answer, ECF No. 80, both parties filed motions for summary judgment, ECF Nos. 85, 86.

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A "genuine" dispute of material fact exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Id.* at 248. "Material" facts are those "that might affect the outcome of the suit under the governing law," as opposed to "disputes that are irrelevant or unnecessary." *Id.* "When both parties move for summary judgment," moreover, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *AT&T Advert., L.P. v. United States*, 147 Fed. Cl. 478, 482 (2020) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## III.   DISCUSSION

It is long settled that the United States may only be sued for a breach of contract by a party that is in contractual privity with. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). Thus, a subcontractor may not generally sue the United States for breach of contract. Like most rules, this one has exceptions, two of which are relevant here. First, if the subcontractor can establish the existence of an implied-in-fact contract, then the subcontractor may sue to enforce the terms of the contract. Second, if the subcontractor can establish that it is an intended third-party beneficiary of another contract, the subcontractor may sue to enforce the terms of that contract. The court addresses each in turn.

### A.   Implied-in-fact contract.

When this court stayed the Government's jurisdictional motion to dismiss, it held in part that Fox had alleged a non-frivolous claim that it had an implied-in-fact contract with the United States. *Fox Logistics & Constr. Co.*, 145 Fed. Cl. 236. The undisputed facts, however, indicate

that no implied-in-fact contract was created.  An implied-in-fact contract is one inferred by a court when "the surrounding circumstances" demonstrate a meeting of the minds between the parties, even if the agreement was never formalized in writing.  *Turping v. United States*, 913 F.3d 1060, 1065 (Fed. Cir. 2019) (citing *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003)).  A subcontractor seeking to establish an implied-in-fact contract must prove the same elements of an express contract: "(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) 'actual authority' on the part of the Government's representative to bind the Government in contract."  *Id.*  Thus, a plaintiff must prove "by objective evidence, the existence of an offer *and a reciprocal acceptance*" to show the "mutuality of intent" necessary for the formation of an implied-in-fact contract.  *Id.* (emphasis added).

Fox claims that "[t]he Government sought FOX's agreement to the alternate payment arrangements and FOX in turn clearly informed the Government that it would stop work absent the Government's oversight of payments through the new account."  ECF No. 86 at 28.  It further contends that since the new "arrangements [were] worked out by all parties, including the Government LTC and FOX . . . [t]his is sufficient to effectuate a meeting of the minds and mutuality of intent to contract, and the attendant modification to the prime contract was approved by the Contracting Officer."  *Id.* at 29.  The Government argues that "Fox's unmet requests—*i.e.*, that the Air Force should pay Fox directly, or that the Air Force must 'control' the new account for Fox to continue to perform—only serve to highlight that the Air Force rejected Fox's 'terms.'  Accordingly there was no 'mutuality of intent,' or exchange of an 'unambiguous offer and acceptance,' between Fox and the Air Force, as no one from the Air Force . . . ever expressed an 'acceptance' of Fox's various payment proposals and demands."  ECF No. 85 at 16 (citation omitted).

Fox has indeed failed to put forward evidence of several of the elements of an implied-in-fact contract.  The lack of any agreement by the Government to Fox's requests and ultimatums demonstrates that there is no mutuality of intent.  Capt. Ban testified that the Air Force considered working directly with Fox and chose not to.  ECF No. 88-2 at 74 (141:12-23).  And she testified that she never intended to create an implied-in-fact contract with Fox.  ECF No. 85-1 at 149 (167:11-14).  It is true that Fox sought direct payment from the Air Force as a condition of returning to work.  ECF No. 88-2 at 32 ¶ 39.  But it is equally true that the Air Force refused to pay Fox directly, which Fox acknowledged in writing.  ECF No. 85-1 at App48-50; ECF No. 88-2 at 7249-51 (Capt. Ban's letter indicating LES shall pay Fox and other subcontractors from amounts received from the Air Force); ECF No. 85-1 at 126-28 (agreement signed by Fox acknowledging that "LES shall pay" Fox for its work).

Fox also demanded that the Air Force control the bank account that Lakeshore used to receive payments for TO 42.  ECF No. 88-2 at 32 ¶ 39.  The Government again refused.  Instead, the Government only obtained "viewing rights."  ECF No. 85-1 at App48-50 ("The government concurs with establishment of the designated holding account and a list of individuals requiring viewing rights was provided to LES . . ."); ECF No. 85-1 at 66 ¶¶ 6-9 (Captain Schoenenberger's testimony as to the "view-only access" to monitor the account).  Fox understood this clearly, signing an agreement that the Air Force would only have viewing rights to the special account created to receive payment for TO 42 (and other Lakeshore projects).  ECF No. 85-1 at App48-50.

The only evidence Fox provides that the Air Force agreed to its terms are Lakeshore's various proposals that the Air Force *never accepted*. *See* ECF No. 88 ¶¶ 20-25 (proposals). As explained above, the Air Force plainly rejected paying Fox directly, and it rejected having control over the Lakeshore special account. Nor does Fox put forward evidence of any agreement by the *contracting officer*—the official with the actual authority to bind the Government—to any of Fox's demands. ECF No. 88-2 at 58 (80:6-11, 80:19-22). Instead, the contracting officer set forth the terms by which *Lakeshore* could cure its default of nonpayment of its subcontractors, including Fox, in the February 7 letter. And Fox made its understanding of these terms clear in in writing. ECF No. 85-1 at App68-69.

Habibi also acknowledged that the Air Force chose not to deal directly with Fox. Although the Air Force requested Fox's DUNS and CAGE codes when considering whether to deal with Fox directly, it did not do so. According to Habibi, on September 11, 2014, he met with AFCEC staff and was told "that when AFCEC requested DUNS and CAGE codes from FOX in late January 2014, AFCEC intended to terminate its contract with Lakeshore for TO 42 and award it to FOX. This was motivated by AFCEC's lack of confidence in Lakeshore dating to late 2013 and because AFCEC considered FOX the 'driving force' behind the TO 42 project." *Id.* at App91 ¶ 42 (citation omitted). But then "TO 42 fell victim to two, larger concurrent events: the drawdown of U.S. forces and the continuing deterioration of the political climate in Afghanistan. Though Lakeshore abandoned TO 42, AFCEC presented the idea of continuing work on the project to Gen. Joseph Dunford, then U.S. NATO commander in Afghanistan. Unfortunately, Gen. Dunford rejected it. AFCEC had no ability to press its case, nor any authority to continue with the project, even though it was near completion and there were sufficient funds available to do so." *Id.* at App91 ¶ 43. Habibi's declaration shows the Air Force considered contracting Fox directly and decided not to, just as Capt. Ban testified. ECF No. 88-2 at 74 (141:12-23) ("Q. Was there any discussion of contracting directly with FOX? A. So the engineers were interested in that. I remember looking into the possibility, but it was not possible and I advised AFCEC that that was not possible. Q. And do you know why it wasn't possible? A. I don't remember specifically, but it had something to do with vetting. The Government cannot just award a contract to anybody. Contractors must be vetted and I believe they were not vetted properly.").

In the end, the only evidence that Fox has put before the court is that it demanded certain things from the Air Force as a condition of returning to work. The fact that Fox returned to work despite knowing that the Air Force did not agree to Fox's demands precludes an implied-in-fact contract based on those demands. Fox has failed to establish a dispute of fact, much less a material one, that there was an implied-in-fact contract. Therefore, summary judgment for the Government is proper on the implied-in-fact contract claim.

### B.    Third-party beneficiary.

Fox alternatively claims that it is a third-party beneficiary of the February 7 changes to the Lakeshore contract. "A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend." *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 117 (2011). Therefore, third-party beneficiary status is an "exceptional privilege," which "should not be granted liberally." *G4S Tech. LLC v. United States*, 779 F.3d 1337, 1340 (Fed. Cir. 2015) (citing *Flexfab, LLC v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005)).

"In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *opinion amended in other respects on reh'g*, 273 F.3d 1072 (Fed. Cir. 2001). In addition, this intent must be "fairly attributable to the contracting officer." *Glass*, 258 F.3d at 1354.

The intent to benefit a subcontractor directly can be "inferred from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party." *Flexfab*, 424 F.3d at 1262-63. Indeed, the Federal Circuit makes clear:

> [F]or a subcontractor to obtain the status of an intended third-party beneficiary, it must provide *clear* evidence that an authorized government official approved a contract provision for the *express* purpose of effectuating payment from the government to the subcontractor(s). . . . The court will not, however, infer that the government intended to directly benefit the subcontractor merely because an authorized government official (1) oversees the activities of the prime contractor; (2) becomes aware that the prime contractor has failed to timely pay its subcontractors, and/or (3) makes funds available to the prime contractor in order for the prime contractor to pay its subcontractors . . . .

*G4S Tech. LLC*, 779 F.3d at 672-73.

There is no contention that Fox was a third-party beneficiary of the contract or TO 42 prior to the February 7, 2014 letter from the contracting officer. Fox contends that the Air Force modified the contract for its direct benefit in the February 7 letter when the contracting officer required the use of the special account and the inclusion of subcontractor repayment plans for future invoices. ECF No. 110 at 1 ("The undisputed evidence shows that Capt. Rebecca Ban, the Air Force's contracting officer (KO) for the TO 42 contract, intended to provide a 'direct benefit' to FOX . . . ."). The parties dispute the new payment arrangement's characterization as a "modification." Fox plainly asserts that there was a modification to the contract. *E.g.,* ECF No. 86 at 25. The Government makes clear that there was no formal contract modification, which is supported by the absence of such a modification in the record. ECF No. 100 at 9 n.7 ("There was no formal contract modification for this purpose.") (cleaned up). That said, the Government addresses whether the February 7 letter modified the contract in such a way to create third-party beneficiary rights in Fox.

### 1. The updated payment process.

To understand the changes to the payment process in the February 7 letter, the court begins with a quick review of how the parties got to February 7. In September 2013, Lakeshore's failure to pay subcontractors came to the Air Force's attention, which resulted in the Air Force sending Lakeshore a notification of its failure to pay its subcontractors under FAR 52.232-5. After receiving this notice, Lakeshore paid Fox in full, and Fox continued working. By November 2013, however, Lakeshore had again failed to make payments to its

subcontractors, and Fox had to suspend work again in January 2014.  In response to the January 7 Notice, Lakeshore recommended using a special account for future payments.  ECF No. 88-2 at 762.  The subsequent discussions between Lakeshore and the Government culminated in Capt. Ban's February 7, 2014, memo about a new payment arrangement.

The memo contains "[t]he government response to elements of [Lakeshore's] proposed plan . . . in detail."  ECF No. 85-1 at 51 ¶ 5.  Under the February 7 letter, Lakeshore could "resume submitting invoices for payment provided that LES continue to submit sub-contractor payment certifications, and that *all payments are made in accordance with that certification immediately upon receipt* of funds from the government."  ECF No. 85-1 at 51 ¶ 5b (emphasis added).  The prime contract already required Lakeshore to submit certifications each time it requested a progress payment, i.e., submitted an invoice, and it specifically required Lakeshore to certify that it was properly paying its subcontractors with each invoice to the Air Force.  *Id.* at 8.  Recall that under FAR 52.232-5, Lakeshore had to include with each invoice the amount of money sought for work by each subcontractor and the amounts previously paid to each subcontractor.  By February 7, 2014, the Air Force was well aware, however, that Lakeshore had not been paying Fox or other subcontractors and recognized that Lakeshore had been filing false certifications of payment.  *E.g.,* ECF No. 88-2 at 700.  Rather than terminate, however, the Air Force sought to have Lakeshore cure its defaults.  So far, this does not change anything because FAR 52.232-5(b) already required such certification and payment.  Thus, there is no modification that Fox could be the beneficiary of here.

That said, the February 7 Letter also required Lakeshore to submit "an agreed upon payment plan with sub-contractors currently in arrears" until Lakeshore became "current with all sub-contractors."  *Id.*  The letter specified that the payment plan "*must be signed by the subcontractor in question*, and include the amounts owed to that sub for work during that invoicing period, the amount . . .  actually . . . paid, the total [arrearage amount] after payment, and the date anticipated to pay the sub in full."  *Id.* (emphasis added).  Further, the February 7 Letter provided that "if at any time, transactions do not occur in accordance with the approved sub-contractor payment certification, this task order will be immediately terminated for default."  *Id.* ¶ 5d.  Put simply, to receive any further payment on the project and avoid termination, the Air Force now required Lakeshore to submit FAR 52.232-5 certifications *and* a repayment plan signed by each subcontractor until Lakeshore became current with all subcontractors.  ECF No. 85-1 at 50-52.  Fox signed such a repayment plan, agreeing to these terms in writing.  ECF No. 88-2 at 397-99.

But there is still the question of whether there is a change.  While it is true that Lakeshore now had to include subcontractor-signed repayment plans with each invoice, that is not a formal change to the contract.  Rather, FAR 52.232-5(b)(v) provided that Lakeshore had to provide "[a]dditional supporting data in a form and detail required by the Contracting Officer."  Given that the contracting officer knew both that Lakeshore was failing to pay its subcontractors and filing false certifications of payment, requiring the additional supporting data in the form of a subcontractor-signed repayment plan that confirmed both the amount in arrears and the plan to bring accounts current was a rational exercise of her authority under the terms of the existing contract.  There was no formal contract modification here, but the court considers whether any changes to the payment process made Fox a third-party beneficiary.

2.      The Government rejected Fox's demands for direct payment.

It is undisputed that Fox demanded "the Air Force should pay Fox directly, or that the Air Force must 'control' the new account for Fox to continue to perform."  ECF No. 85 at 16; *see also* ECF No. 85-1 at 20, 45, 88-89, 99; ECF No. 88-2 at 757 ("FOX is waiting for AFCEC's control of the special account as there is no trust on LTC and their corporate gaming policies anymore.")  Fox contends that it put the Government on notice of these demands that were, according to Fox, conditions precedent to its continued performance in two emails it sent to Lt. Col. Reich and Maj. Jajliardo in January 2014, both of which were forwarded to Capt. Ban.  In these emails, Fox stated that it "would not return to work until TO 42 funds were deposited directly into the 'Holding Account' and that CO [Contracting Officer] controlled the 'Holding Account.'"  ECF No. 88-2 at 753-59 (emails).  Further, in a December 2013 meeting, Habibi told Lt. Col. Reich, that Fox could not continue to perform its work on TO 42 as Fox "see[s] no success in getting funds from [Lakeshore]."  ECF No. 101 ¶ 16.  By February 2014, "Fox had informed members of the Air Force contract staff that it would cease performance if the Air Force did not 'control' the contract funds . . . or otherwise pay Fox directly."  *Id.* ¶ 84.  The parties agree that Capt. Ban was aware at the time that Fox was threatening to discontinue performance.  *Id.* ¶ 25.  Thus, according to Fox, the Contracting Officer "knew that, given the fact that the prime was incapable of completing the project with its own funds, the necessary condition to complete TO 42 was getting FOX back to work."  ECF No. 110 at 4.

Fox argues that its ultimatums, and the contracting officer's knowledge thereof, created conditions precedent sufficient to establish third-party beneficiary status under *Flexfab*.  As the Federal Circuit explained:

> [W]hen a government agent with authority to contract on the government's behalf knows of a condition precedent to a third party's performance as a sub-contractor, such as receipt of payment directly from the government, and specifically modifies the prime contract so as to ensure the third party's continued performance, the agent and by implication the government itself necessarily intend to benefit the third party.  That intent gives rise to standing as a third-party beneficiary to enforce the prime contract.

424 F.3d at 1263.  But in *Flexfab*, the Federal Circuit, reviewing a grant of summary judgment against a subcontractor suing under Fox's theories, found that "[n]either the contract nor the modification show[ed] any intent by the contracting officers to benefit [the subcontractor] Flexfab by linking in any way the remittance address to Flexfab.  Looking beyond the contract itself, Flexfab can point to no evidence of record that establishes such intent."  *Flexfab*, 424 F.3d at 1264.  There, the plaintiff failed to prove that "one with authority to bind the government" had any intent to contract directly with the subcontractor.  *Id.* at 1265.

Fox's reliance on *Flexfab* is misguided because Fox knowingly entered the repayment plan agreement under which Lakeshore—not the Air Force—would continue to pay Fox.  ECF No. 85-1 at 126-28.  The evidence Fox has presented about a joint account does not support the contention that it was a joint account, or that the Air Force ever agreed to control the account.

The documents cited in support of this assertion reflect only Lakeshore's various proposals—they reflect no agreement by the Air Force (the crucial fact these documents are cited for).[3]  Fox similarly relies on a Lakeshore PowerPoint to support its assertion that the Contracting Officer "modif[ied] the remittance clause and assigned TO 42 funds to pay FOX 100% and LTC 0% from the funds disbursed by the Government to the special account that AFCEC would 'actively view all incoming and outgoing activity to ensure proceeds are directed as agreed into each project.'"  *E.g.*, ECF No. 86 at 7, 11, & 12; ECF No. 88 ¶ 40.  Fox's other citation for this assertion is a portion of Capt. Ban's deposition where counsel for Fox asked her to read the same page of the PowerPoint into the record.  ECF No. 88-2 at 51 (50:14-18).  But the PowerPoint was a *proposal by Lakeshore*, not evidence of what the Air Force agreed to.

The record, however, is clear that Fox knew the Air Force would not pay it directly or control the special account.  Fox's repayment plan with Lakeshore makes this plain.  It states very clearly that Fox was agreeing to a payment mechanism whereby the Air Force would pay Lakeshore and Lakeshore would pay Fox: "*LES shall pay Fox* the above amounts on LES' submitted invoices 26, 27, 28 and 29 immediately upon receipt of funds from AFCEC which total $3,309,890.01, leaving a balance of principal and interest in the amount of $3,172,172.16 and imputed interest thereon."  ECF No. 88-2 at 1081-82 (emphasis added).  Fox tries to avoid this with Habibi's testimony that when he signed the repayment plan he was "relying upon the express promises FOX received from [Maj. Jajliardo, Capt. Knost, Lt. Col. Reich, and Lt. Col. Geer] . . . that FOX was not to be paid by Lakeshore, and instead AFCEC put into place a payment mechanism whereby all TO 42 payments were to be made by DFAS into a Special Account and from the Special Account to Fox."  *Id.* at 321 ¶ 37.  But Habibi knew what he was signing, and that it contained clear language that the Air Force would only pay Lakeshore.  There is also another reason to conclude that Fox came back to work understanding it would be paid by Lakeshore.  As discussed in detail below, *see infra* at B.3, Fox accepted more than $4 million in payments (without complaint) directly from Lakeshore, not the Air Force.

Fox was also clearly aware that the Air Force had viewing rights to the special account.  While Lakeshore's characterization in its February 3, 2014, letter to Fox may suggest something more than mere viewing rights, *Id.* at 380 ("Lakeshore has provided AFCEC viewing or other account rights that AFCEC shall request in order to monitor and/or control (at its discretion and choice) the proceeds . . ."), this is not evidence of what the Air Force agreed to.  Moreover, the terms of Fox and Lakeshore's payment plan are that "LES . . . directs payment of all proceeds . . . [and t]his special bank account shall provide AFCEC with full access viewing rights to monitor

---

[3] Fox cites six paragraphs of its statement of facts, ECF No. 88 ¶¶ 20-25, none of which evince an agreement to any terms by the Air Force:  ¶ 20: Lakeshore proposes a method to make payments into a joint account.  ¶ 21: Lakeshore reiterates its openness to discuss that proposal.  ¶ 22: Lakeshore stating it lacks funds to pay subcontractors in TO 42.  ¶ 23: Lakeshore proposes alternative payment mechanisms for TO 42.  ¶ 24: Lakeshore asking if its proposal is possible.  ¶ 25: Lakeshore's statement that "We understand that due to the recurrence of delayed payments AFCEC has expressed the thought that perhaps a similar arrangement might be possible with Shindand [TO 42]."

all proceeds." *Id.* at 398.  Fox has put forward no evidence the Air Force ever had the ability to control Lakeshore's special account or do anything more than view the account.

A review of cases confirms that the changes here do not meet the heavy burden of establishing third-party beneficiary status.  "[C]ases in which a subcontractor was found to have third-party beneficiary status involve a payment mechanism by which the subcontractor has direct access to payments made by the government."  *Constructora Guzman, SA v. United States*, 161 Fed. Cl. 686, 694 (2022) (collecting cases).  "Where a subcontractor seeks recognition as an intended beneficiary of a federal contract, it is possible to infer the requisite intent on the part of the government 'from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party.'"  *G4S Tech. LLC*, 114 Fed. Cl. at 671 (quoting *Flexfab*, 424 F.3d at 1262).  But "[n]otwithstanding this theoretical possibility, it is extremely difficult to establish status as an intended third-party beneficiary by inference in the context of a government contract."  *G4S Tech, LLC*, 114 Fed. Cl. at 671; *see, e.g.*, *Flexfab*, 424 F.3d at 1263-65 (declining to infer contracting officer's knowledge or intent based on actions of other contracting personnel); *US Ecology, Inc. v. United States*, 245 F.3d 1352, 1356 (Fed. Cir. 2001) (holding government's cooperation with third-party insufficient to establish third-party beneficiary status); *O. Ahlborg & Sons, Inc. v. United States*, 74 Fed. Cl. 178, 189-90 (2006) (holding government's involvement in negotiating subcontracts and program oversight insufficient to establish contractual privity with subcontractor); *JGB Enters., Inc. v. United States*, 63 Fed. Cl. 319, 334 (2004) (declining to infer contracting officer's knowledge or intent based on actions of other contracting personnel).

In *Guzman*, the State Department negotiated a modification to a contract to renovate an embassy in Guyana that allowed the State Department to retain a portion of each payment due to the prime contractor in lieu of Miller Act bonding requirements.  *Guzman*, 161 Fed. Cl. 686.  The State Department then released the retainage amount to the prime contractor while the subcontractor went unpaid.  The subcontractor sued, claiming third-party beneficiary status.  The court held that the subcontractor was not a third-party beneficiary because the modification did nothing to alter the payor (still the prime contractor) and thus never created a relationship of direct payment between the State Department and the subcontractor.  In other words, the State Department "neither expressly nor impliedly demonstrated any intent to be directly liable for payment to [the prime's] subcontractors."  *Id.* at 695.

As in *Guzman*, the modification here did nothing to alter the payor or payee, and Fox has not presented evidence that the modification created a relationship of direct payment between the Air Force and the Fox.  *See also G4S Techs.*, 114 Fed. Cl. 662.  Instead, the undisputed evidence shows that under the modified payment mechanism, "as in *G4S Technologies*, all payments flowed from [the Air Force] to [the prime contractor], who was then required to pay its subcontractors."  *Guzman*, 161 Fed. Cl. at 695.  Of course, this requirement of paying the subcontractors predated the post-February 7 Letter from the Contracting Officer.

Synthesizing applicable case law, the court in *Guzman* unified the holdings of a line of cases cited by the parties here.  *See id.* at 694 (collecting cases).  In *D & H Distributing Co. v. United States*, 102 F.3d 542, 547 (Fed. Cir. 1996), a subcontractor sued the United States after the contractor failed to pay the subcontractor under an explicit joint payment arrangement.  The

Federal Circuit ruled that while there was no implied-in-fact contract, the subcontractor was a third-party beneficiary due to the joint payment clause whose "entire purpose was to provide protection for [the subcontractor] by giving it a right to control the disbursement of the contract proceeds and thereby to ensure that its invoice to [the prime] would be paid." *Id.* at 547.  In *J.G.B. Enterprises, Inc. v. United States*, a subcontractor sued the United States for payment for hose assemblies on a DOD contract after the contractor became insolvent.  63 Fed. Cl. at 319. The Court of Federal Claims found the subcontractor was a third-party beneficiary because the government was contractually obligated to make payments into an escrow account accessible by a subcontractor; the Federal Circuit affirmed.  *Id.*  In *G4S Technology*, a subcontractor suing the United States under a third-party beneficiary theory appealed this court's grant of summary judgment for the Government, finding the subcontractor was not a direct beneficiary.  779 F.3d 1337.  The payment mechanism at issue in *G4S* required the contractor to request funds attached to a specific purpose, such as payment to subcontractors and support its requests by documentation, such as subcontractor invoices, and the Department of Agriculture was to pay all subcontractors indirectly, *i.e.*, through payment to the contractor.  The Federal Circuit affirmed, holding that the subcontractor was not a third-party beneficiary.  *Id.*

That line of cases collected in *Guzman* only goes to show what did not happen here.  The facts of these cases center on changes in payee or payor, or changes in the degree of subcontractor control over funds in the account used for payments.  Unlike *Norwest Bank*, Fox did not condition continued work on the prime contractor's "assign[ment of] its payments on the contract to [the subcontractor's] bank."  *Norwest Bank Ariz., N.A. v. United States*, 37 Fed. Cl. 605, 606 (1997).  Although initially demanding direct payment, Fox agreed in writing that it would be paid by Lakeshore under the modification terms.  ECF No. 88-2 at 380, 1081.  Unlike *JGB*, the parties here did not agree to send the government's payments to an "escrow agent" who would "disburse them directly to [the subcontractor] as appropriate."  *J.G.B. Enters. v. United States*, 497 F.3d at 1260.

In *D & H Distributing Co.*, a modification to a contract for computer hard disks included a joint payment mechanism, whereby the Government would thenceforth pay both the contractor and subcontractor.  102 F.3d. at 544.  The National Security Agency then issued a check for the full contract price in the contractor's name only, in response to an invoice submitted by that contractor.  The Federal Circuit held that the subcontractor—a third-party beneficiary whose "interests, specifically protected by the contract, would be impaired if the beneficiary were not accorded the right to obtain relief against the promisor in the event of a breach"—had standing to enforce the payment provision of the modification.  *Id.*  The breach in *D & H* was the Government's payment to the contractor only, a failure to comply with the joint-payee modification terms.  *Id.* at 547.  Unlike *D & H*, here the Air Force did not make Lakeshore and Fox "joint payees for the proceeds of the contract," *id.* at 544, nor is there any non-compliance by the Government with the terms of the modification that amounts to breach.

No matter how vocally Fox demanded direct payment, Fox signed a document saying it would not be paid directly by the Air Force.  Given that the Air Force rejected the demands and Fox returned to work anyway, there was no condition precedent to Fox's performance.  *See* ECF No. 88-2 at 380, 397-99, 1081.

        3.      <u>No breach of the updated payment mechanism.</u>

According to Fox:

> The entire purpose of the AFCEC Special Account was to provide
> verification that the funds will be used to pay for the work for TO
> 42, and nothing more SOF 57 [sic] protection for FOX by having
> the Government retain the ability to access and monitor the Special
> Account and thereby to ensure that its invoice to LTC would be
> paid as it had demanded and to avoid the Government being left
> with "nothing". SOF 54 [sic] The rights conferred on FOX were
> designed to effectuate the payment of LTC's debt to it. This case
> therefore presents a particularly clear instance in which the creditor
> beneficiary's interests, specifically protected by the Contract,
> would be impaired if the beneficiary were not accorded the right to
> obtain relief against the promisor in the event of a breach. (citation
> omitted). Accordingly, FOX is entitled to enforce the payment
> provision of the Contract, and that [sic] the breach of that provision
> by the Government gave FOX a cause of action for damages.

ECF No. 86 at 24-25.

Even assuming that Fox is a third-party beneficiary of the changed payment mechanism, Fox has not put forward any evidence that shows that the Air Force breached Task Order 42. That is, Fox has failed to establish "a non-performance of any contractual duty of immediate performance" by the Air Force., irrespective of the validity of Fox's claim to third-party beneficiary status. Restatement (First) of Contracts § 312 (1932).

The Air Force processed the four invoices submitted by Lakeshore, paying Lakeshore $4,052,085.01, as agreed. And Fox received all four payments owed to it under its agreement with Lakeshore.

- On February 27, 2014, AFCEC wired $3,466,448.76 to Lakeshore for multiple invoices on two task orders (TO 32 and TO 42). The Air Force inadvertently sent this payment to Lakeshore's general, pre-modification account. ECF No. 88-2 at 321 ¶ 39, 1093, 1104. The same day, Lakeshore reported the receipt of the funds in the wrong account in an email to Capt. Ban, adding that it had already "transferred it over" to the special account and "wired out the funds to the subcontractors as promised in our plan." *Id.* Exs. 52-53; *see also* Ex. 54 (summary of transactions). At a meeting on March 5, Lakeshore and the Government explicitly worked to resolve the issue going forward so that payment on invoices would funnel directly to the Special Account. ECF No. 88-2 Ex. 61. "FOX was unaware at the time of AFCEC's error" and did not find out about the mistake until it read Lara Schoenenberger's Declaration dated April 1, 2019. ECF No. 85-1 at App90 ¶ 39. Regardless of the initial mistake, the funds ended up reaching Fox through the proper channels after Lakeshore's correction. This mistake, which was so quickly cured and unknown to Fox until five years later,

was harmless error.  Along with two other subcontractors, Lakeshore paid Fox its portion, $3,309,890.01, ECF No. 88-2 at 1106, with Fox receiving the net amount of $3,309,855.00.  ECF No. 85-1 at App90 ¶ 38.[4]

- On April 17, 2014, AFCEC made a payment of $316,719.18 to Lakeshore.  ECF No. 88-2 at 1112.  That day, Lakeshore made two payments to Fox of $117,836.79 and $128,882.00.  *Id.* at 1114.  Fox reports that two days later it received the net amounts of $117,801.79 and $128,847.00, respectively.  ECF No. 85-1 at App90 ¶ 38.

- Then on April 24, 2014, AFCEC paid Lakeshore $565,616.22.  ECF No. 88-2 at 1114.  On April 28, Lakeshore paid Fox $495,616.22.  *Id.*  Fox reports that the next day it received the net amount of $495,581.22.  ECF No. 85-1 at App90 ¶ 38.

Again, under its contract Lakeshore had a pre-existing duty to pay its subcontractors.  Lakeshore's failure to pay its subcontractors placed it in default, prompting Government warnings of potential termination.  The new payment arrangement—whether a contract modification or merely the exercise of Capt. Ban's existing authority to require additional information for approval of invoices under FAR 52.232-5—was a means of curing Lakeshore's default.  The Air Force followed it faithfully.  None of this amounts to a breach by the Government.

Lakeshore's collection of payment on invoices, declaration of Chapter 7 bankruptcy, and May 1, 2014, decampment from Afghanistan do not make the Government the appropriate party, nor this court the appropriate forum, for Fox to seek relief.  ECF No. 85-1 at App91 ¶ 41; ECF No. 88-2 at 329-34.  In Maj. Jajliardo's post-hoc estimation, "Lakeshore underbid numerous tsk [sic] orders in the (expected) final months of their solvency in order to leverage the credit capacity of the subs to invoice large quantities of work, receive payment, and then declare bankruptcy."  ECF No. 88-2 at 330.  Even accepting that to be true, that does not support a breach by the Air Force.  Nobody contends or believes that Lakeshore was an ethical actor; in fact, the record detailed above demonstrates that Lakeshore was filing false certifications of subcontractor payment to get itself paid.  But Lakeshore's filing bankruptcy, even with improper intent, does not convert the Air Force into a guarantor of Lakeshore's debt to Fox.  If Lakeshore still owes Fox money for work performed under their subcontract, that is an issue for the bankruptcy court, not this one.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS the Government's motion for summary judgment, ECF No. 85, and DENIES Plaintiff's motion for summary judgment, ECF No. 86.  The Clerk's Office is directed to enter judgment for the United States accordingly.

It is so ORDERED.

---

[4] The discrepancy between these two amounts is due to the cost of the wire transfer, which was borne by Fox.

20

s/ Edward H. Meyers
Edward H. Meyers
Judge